IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CARL JEFFREY PARKS                                                                PLAINTIFF

v.                          Civil No. 11-5006

SHERIFF KEITH FERGUSON;
JAIL ADMINISTRATOR ROBERT
HOLLY; JAIL DOCTOR JOHN HUSKINS;
DEPUTY STETTNISCH; NURSE SMITH;
and NURSE HARTGRAVES                                                            DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff, Carl Jeffrey Parks, pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis*. He has sued Defendants in both their individual and official capacities.

Plaintiff is currently incarcerated in the Arkansas Department of Correction (ADC), North Central Unit, in Calico Rock, Arkansas. The events at issue in this case occurred while Plaintiff was incarcerated in the Benton County Detention Center (BCDC) in Bentonville, Arkansas, from August 25, 2010, to May 10, 2011. Specifically, Plaintiff maintains he was denied adequate medical care for a back condition he had that was aggravated by injuries he sustained in November of 2010, while trying to assist in fixing a cell door.

Defendants have demanded a jury trial. On September 28, 2011, a pretrial evidentiary hearing was held to determine if any issues triable to a jury exist. Following the hearing, a subpoena was issued for the records from Estes Chiropractic Clinic.[1] Defendants were also given until October 28, 2011, to file a post-hearing brief on the issue of qualified immunity. Plaintiff was given until November 10, 2011, to file a response to Defendants' brief. Plaintiff did not file a response.

---
[1] The records have been marked Plaintiff's Exhibit 5.

**1. Background and Evidence Presented**

The testimony of the following witnesses was taken: (1) Kyle Kallstrom; (2) the Plaintiff, Carl J. Parks; (3) Dr. John Huskins, a named Defendant; (4) Nurse Marsha Smith, a named Defendant; (5) Nurse Gail Hartgraves, a named Defendant; (6) Captain Robert Holly, a named Defendant; and (7) Sheriff Keith Ferguson, a named Defendant. For purposes of discussion, their testimony and the evidence presented will be summarized.

Prior to his incarceration at the BCDC, Plaintiff testified he was being treated for back pain by Dr. Poemoceah with hydrocodone and clonazepam. Defendants' Exhibit (hereinafter Defts' Ex.) 7. Plaintiff was provided with pain relieving medication following his incarceration.

Dr. Huskins, the jail physician, testified he first saw Plaintiff on September 8, 2010, due to complaints of back pain in the mid-thoracic region and allergies. Dr. Huskins prescribed Tylenol, three times a day for ten days, and requested Plaintiff's records from his treating physician. Defts' Ex. 17 at pg. 1; Defts' Ex. 6. On September 10th, after receiving the records, Dr. Huskins prescribed Vicodin and Flexeril. Defts' Ex. 17 at pg. 1.

On September 16th, the Flexeril was discontinued and Soma (carisoprodol) prescribed instead. Id. at pg. 2. Plaintiff continued to complain of body aches and on September 20th, Dr. Huskins increased the Soma prescription. Id. When this did not provide Plaintiff with any relief, Plaintiff was taken off Soma and put on Klonopin. Id.

On October 6th, Plaintiff was seen with complaints of back pain and requested steroids. Defts' Ex. 17 at pg. 3. Dr. Huskins asked for Plaintiff's records again. Id. Following an October 4th request by Plaintiff to be assigned to a work detail, Defts' Ex. 8, Dr. Huskins noted that Plaintiff was on narcotics for pain control and for safety reasons Plaintiff could not be put on a work detail. Defts' Ex. 17 at pg. 3.

On October 22nd, Plaintiff was given a cortisone shot for his back. Id. at pg. 4. When Plaintiff complained of soreness in the area where he received the shot, he was placed on bed rest. Id. On

November 4th, Plaintiff's Vicodin prescription was changed from an as needed basis to a schedule of four times per day.  Id. at pg. 5.

On or about November 17th, at the request of Deputy Stettnisch, four or five inmates, including the Plaintiff, were working on the cell doors.  The process involved placing a folded up towel at the bottom of the door between the frame and the door, slamming it shut, and pulling it open after several minutes had passed.  When he pulled on a cell door that was stuck, Plaintiff felt a sharp pain between his shoulder blades.  He knew right away that he had injured his back and asked to see the doctor.  Dr. Huskins was not at the BCDC at that time.  Nurse Smith placed Plaintiff's name on the list of inmates to be seen the following day.

Kyle Kallstrom, a fellow inmate, testified that he was present when Plaintiff sustained the injury to his back.  Kallstrom testified that when Plaintiff pulled on the door Kallstrom heard something "pop" and it was obvious Plaintiff was in pain.

Plaintiff testified that by the next day, November 18th, he was in excruciating pain.  Plaintiff was seen by Dr. Huskins and complained of significant mid to low back pain.  Defts' Ex. 17 at pg. 5.  Dr. Huskins continued the Vicodin and Klonopin and added Motrin.  Id.  On November 19th, Dr. Huskins ordered x-rays.  Id.

Plaintiff testified his condition continued to worsen despite the fact that he saw Dr. Huskins once or twice a week.  On November 23rd, an x-ray of Plaintiff's lumbar spine was taken.  Defts' Ex. 9.  The x-ray showed "[m]ild degenerative disc disease and facet degeneration change at L4-L5 and L5-S1, slightly progressed when compared to the previous exam."  Id.  Plaintiff maintained the x-ray was too low on his torso.

On November 29th, Plaintiff was seen complaining of upper and lower back pain and a cough.  Defts' Ex. 17 at pg. 6.  Dr. Huskins approved bed rest for the Plaintiff.

On December 6th, Dr. Huskins ordered x-rays of Plaintiff's cervical and thoracic spine due to continued complaints of pain. Id. Dr. Huskins testified that the x-rays showed minimal changes in the thoracic spine but marked changes in the cervical spine. Id. at pgs. 6-7.

Specifically, the x-rays of the thoracic spine revealed "[m]ild intervertebral disc disease identified throughout the thoracic spine. No acute thoracic spine abnormality identified." Defts' Ex. 25 at pg. 1. The x-rays of the cervical spine showed "[m]ild spondylosis at C5-C6 and C6-C7 with moderate arthritic change involving the apophyseal joints of the cervical spine. No acute cervical spine abnormality identified." Id. at pg. 2.

On January 15, 2011, Plaintiff was seen by Nurse Hartgraves. Id. at pg. 8. Plaintiff complained of numbness and tingling in his back. Id. He was placed on bed rest but his condition did not improve and Plaintiff was sent to Mercy Medical Center to be evaluated. Id.; see also Defts' Ex. 23. He was diagnosed with back pain and muscle strain. Defts' Ex. 23.[2] He was discharged with instructions to take Clindamycin four times a day for four days and Vicodin every six hours, as needed, for pain. Id. He was also to follow-up with Dr. Webb. Id.

Plaintiff had a follow-up appointment with Dr. Huskins on January 19th. Defts' Ex. 17 at pg. 9. Dr. Huskins kept Plaintiff on Clindamycin and Vicodin, added Flexeril and ordered a spinal consultation with an orthopaedic doctor. Id.

Nurse Smith testified that as one of the jail nurses she scheduled appointments for inmates. It was her understanding that when she called for an appointment she was given the first available appointment. On February 15th, when she called to schedule an appointment at Ozark Orthopaedics, the first available appointment was March 2nd. It is not clear from the testimony how Plaintiff ended up with an earlier appointment but he was first seen at Ozark Orthopaedics by Julie Slavik, PAC, on January 27th. Defts' Ex. 1 at pgs. 2-3. He was diagnosed as having thoracic pain, C8 radiculopathy and right lateral leg pain. Id. at pg. 3. Physical therapy or possible chiropractic adjustments were

---

[2] The pages of this exhibit are not numbered. However, the records are in chronological order.

recommended. Id. It was noted that a magnetic resonance imaging (MRI) would be helpful but "conservative treatment first would be very appropriate." Id. Dr. Huskins testified that on January 28th, he authorized the scheduling of an MRI.

Plaintiff continued to complain of pain and, on January 31st, was prescribed MS Contin (oral morphine). Defts' Ex. 17 at pg. 10. On February 4th, Plaintiff requested and was given an increase in the dose of MS Contin. Id.

On February 7, 2011, a MRI was done. Defts' Ex. 15. The MRI showed "[s]evere cervical spondylosis with C5-C6 and C6-C7 large posterior and posterolateral bulge and spurring, causing severe foraminal and moderate to severe spinal canal stenosis. C3-C-4 markedly large right paracentral disc herniation which is extruded inferiorly, causing severe right foraminal stenosis." Id.

When Dr. Huskins reviewed the MRI results with Plaintiff, Dr. Huskins authorized a return visit for Plaintiff at Ozark Orthopaedics. Defts' Ex. 17. at pg. 11. Plaintiff was seen at Ozark Orthopedics again on March 2nd and referred to a chiropractor. Defts' Ex. 1 at pgs. 32-33.

On April 12th, when Plaintiff was seen complaining of back pain due to a fall on the previous day, Nurse Smith contacted Dr. Huskins and Plaintiff was approved for an additional dose of morphine. On April 18th, when Plaintiff fell again, Nurse Smith testified Plaintiff was sent to the emergency room for evaluation. Torodal was prescribed and Dr. Huskins authorized Plaintiff to receive this along with his other medications.

On April 15th, Nurse Hartgraves testified Plaintiff was brought to the nurse's station by Sergeant McCraine and Sheriff Ferguson. Plaintiff was in tears and stated he was suffering from back pain and nothing had been done. Nurse Hartgraves reminded him that he had just been started on prednisone the previous day and was on pain medication. She advised Plaintiff that the first chiropractic appointment was cancelled when Dr. Barnes' office required an up front cash payment. Plaintiff was informed that another appointment had been scheduled.

Plaintiff's son had passed away the week before and Plaintiff was also worried about his ability to work after he was released with his "back out." Nurse Hartgraves testified that Plaintiff accused Benton County of delaying his medical care so it would not be liable for his medical bills. Nurse Hartgraves indicated she reminded Plaintiff that they had no idea when he would leave their care and his care was proceeding appropriately.

Sheriff Ferguson testified that he accompanied the Plaintiff and McCraine to the nurse's station on April 15th. Sheriff Ferguson recalled hearing that Plaintiff's son had passed away and believed that may have been why he visited with the Plaintiff. While his recollection of the conversation he had with Plaintiff was vague, Sheriff Ferguson could recall saying that Plaintiff had to "look forward," but did not recall discussing Plaintiff's medical condition with him.

With respect to the chiropractor, Nurse Smith testified she initially scheduled an appointment with Dr. Barnes for March 30th. However, on March 29th, Dr. Barnes' office called and stated they would not see Plaintiff without a $100 payment at the time of service. Despite, Nurse Smith's assurances that the county would take care of the cost of the visit, Dr. Barnes' office insisted $100 be paid up front. As this issue had never arisen before, Nurse Smith checked with Dr. Huskins who advised her to make an appointment with someone else.

Captain Holly testified that he was the jail administrator. He indicated the jail did not have a petty cash fund. Usually when payment up front was requested, Captain Holly testified a letter was written guaranteeing payment. He indicated it was also possible for payment to be made with a credit card. However, he was not consulted about the demand for payment made by Dr. Barnes.

Nurse Smith made an appointment for April 19th with Mark Estes, D.C., of Estes Chiropractic. Plff's Ex. 5 ; Defts' Ex. 17 at pgs.12-13. Plaintiff was seen again April 21st, April 26th, and May 3rd. Id. By May 3rd, it was noted that Plaintiff's "condition is resolved." Plff's Ex. 5 at pg. 9. No more visits were scheduled and Plaintiff was informed to contact the office if his symptoms reappeared. Id.

During this entire period of time, Plaintiff continued receiving pain medication and his

medications were adjusted or changed on various occasions. Defts' Ex. 17 at pgs. 11-18. Plaintiff testified the chiropractic treatment helped tremendously and eliminated his need for pain medication. In Plaintiff's view, the MRI and referral to the chiropractor should have been done much sooner. Plaintiff talked to both nurses, the doctor, and Captain Holly about his condition.

According to Plaintiff, Captain Holly also responded to grievances. Plaintiff also testified that one day when he went to see Dr. Huskins, Sheriff Ferguson was there and told the doctor to schedule an MRI. Plaintiff explained that he named both Nurse Smith and Nurse Hartgraves as Defendants because they were present at the doctor's visits. Plaintiff testified that neither did anything wrong. Plaintiff explained that he named Detective Stettnisch as a Defendant because he was present when the injury occurred.

As jail administrator, Captain Holly testified that he responds to any grievances dealing with the civil rights of inmates. If Captain Holly was not at the facility, Lieutenant Carter would respond to the grievances. With respect to grievances relating to medical care, Captain Holly indicated that if he knew the inmate was receiving medical care he would defer to the medical staff. He recalled talking to Plaintiff on a couple of occasions regarding his medical condition.

### 2. Applicable Standard

A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Johnson v. Bi–State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence." Id.

### 3. Discussion

Section 1983 provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws." 42 U.S.C. § 1983. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). The qualified immunity inquiry consists of two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010). The order in which these questions are addressed is left to the discretion of the judge. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

I begin with the question of whether the facts support Plaintiff's claim that Defendants violated his Eighth Amendment rights by exhibiting deliberate indifference to his serious medical needs. "Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989)(citation omitted). "Deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." Gordon v. Frank, 454 F.3d 858, 862 (2006)(internal citation omitted). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those

-7-

needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F. 3d 1234, 1239 (8th Cir. 1997)).

It is not necessary for the Plaintiff to show a total deprivation of medical care. Langford, 614 F. 3d at 460. "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment. To state a claim based on inadequate medical treatment the plaintiff must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Id. (internal quotation marks and citations omitted).

It is undisputed that Plaintiff had serious medical needs with respect to his back. He was under a doctor's treatment prior to and after incarceration and was given a variety of medications including narcotic pain medication to provide relief from pain. Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008)(A medical need is objectively serious when the condition has been diagnosed by a physician as requiring treatment or is so obvious that a layperson would recognize the need for a physician's attention).

With respect to Deputy Stettnisch, Plaintiff testified that he named the deputy as a Defendant solely because he was present when Plaintiff was injured. This provides no basis of liability. See e.g., Ripson v. Alles, 21 F.3d 805, 808-09 (8th Cir. 1994)(Defendant is entitled to judgment in his favor where he was not personally or directly involved in the alleged constitutional violation).

Sheriff Ferguson and Captain Holly, as supervisory officials, cannot be held liable on a theory of respondeat superior. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Instead, "a supervisor is only liable for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the corrective inaction constitutes deliberate indifference toward the violation. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye to it." Meloy v. Backmeier, 302 F.3d 845, 849 (8th Cir. 2002)(internal

quotation marks and citations omitted). When the supervisor "lacks medical expertise [he cannot be] liable for the medical staff's diagnostic decisions" and "cannot substitute [his] judgment for a medical professional's" judgment. Id.

Sheriff Ferguson and Captain Holly did not personally provide medical treatment to the Plaintiff and were not personally involved in determining what medical care Plaintiff should receive or the timing of medical care that was provided. McRaven v. Sanders, 577 F.3d 974, 981 (8th Cir. 2009)("A prison official may rely on a medical professional's opinion if such reliance is reasonable")(citation omitted). There is nothing to suggest that their reliance on the judgment of the medical staff was unreasonable. Therefore, neither could have violated Plaintiff's Eighth Amendment rights. In their individual capacities, they are entitled to qualified immunity. VanHorn v. Oelschlager, 502 F.3d 775, 778 (8th Cir. 2007)(Qualified immunity is a defense available only to governmental employees sued in their individual capacities).

With respect to the medical Defendants, Nurse Smith, Nurse Hartgraves, and Dr. Huskins, I believe no reasonable jury could find that these Defendants exhibited deliberate indifference to Plaintiff's serious medical needs. Plaintiff testified neither Nurse Smith nor Nurse Hartgraves had done "anything wrong." Instead, they were named as Defendants solely because they were present at his visits with Dr. Huskins.

In regard to Dr. Huskins, Plaintiff was: seen on numerous occasions; prescribed a variety of medications which were either eliminated, the dosage adjusted, or other drugs prescribed in conjunction with them, if they proved to be ineffective by themselves; sent to the hospital at least two different times; referred to an orthopedic doctor; and referred to a chiropractor. Nelson v. Shuffman, 603 F.3d 439, 448-49 (8th Cir. 2010)(Prison physicians are free to exercise their independent judgment and prisoner's mere disagreement of opinion over matters of expert medical judgment or over course of treatment does not rise to the level of a constitutional violation).

Although there was some delay in Plaintiff's initial receipt of chiropractic care, there is no evidence that Plaintiff suffered adverse consequences because of this delay. Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005)(objective seriousness of delay in treatment must be measured by reference to effect of delay, which must be shown by verifying medical evidence). Furthermore, there is no evidence the delay was intentional. Nurse Smith first learned of Dr. Barnes' demand for payment up front on March 29th. She consulted Dr. Huskins and then scheduled an appointment with another chiropractor. Although Captain Holly could have been consulted and a method of payment arranged through him, I do not believe the delay can be said to have resulted in deliberate indifference to Plaintiff's serious medical needs. See e.g., Plemmons v. Roberts, 439 F.3d 818, 823 (8th Cir. 2006)("For delay to create an actionable Eighth Amendment violation . . . [the] official's actions (or inaction) must be so dangerous to the health or safety of the inmate that the official can be presumed to have knowledge of a risk to the inmate").

"The inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id. at 449. Plaintiff has failed to clear this threshold. I cannot say that the conduct of the medical staff violated Plaintiff's constitutional rights. They are therefore entitled to qualified immunity.

"Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights." Gorman v. Bartch, 152 F.3d 907, 914 (8th Cir. 1998)(citation omitted). Plaintiff produced no evidence suggesting that a policy, custom, or practice of Benton County operated to deprive him of adequate medical care.

### 4. Conclusion

For the reasons stated, I recommend that: the Defendants be found to be entitled to qualified immunity on the individual capacity claims; it be found that there is no basis for liability on the official

capacity claims; and, the case be dismissed in its entirety because the evidence does not present a sufficient disagreement to require submission to the jury.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of January 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE